UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
VINCENT A. PIAZZA,

                    Plaintiff,

                                        MEMORANDUM & ORDER
          -against-                     13-CV-2230(JS)

CAROLYN W. COLVIN, Commissioner
of Social Security,

                    Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:      Vincent Piazza, pro se
                    13 Westwood Drive
                    North Babylon, NY 11703

For Defendant:      Kenneth M. Abell, Esq.
                    United States Attorney's Office
                    610 Federal Plaza, 5th Floor
                    Central Islip, NY 11722

SEYBERT, District Judge:

          Pro se plaintiff Vincent Piazza ("Plaintiff") commenced

this appeal pursuant to Sections 205(g) and 1631(c)(3) of the

Social Security Act, 42 U.S.C. §§ 405(g), 1631(c)(3) challenging

defendant the Commissioner of Social Security's (the

"Commissioner") denial of his applications for disability

insurance benefits and supplemental security income.  Presently

before the Court is the Commissioner's unopposed motion for

judgment on the pleadings.  (Docket Entry 12.)  For the following

reasons, the Commissioner's motion is DENIED and this action is

REMANDED to the Commissioner for further proceedings consistent

with this Memorandum and Order.

Plaintiff filed applications for disability insurance benefits and supplemental security income on May 14, 2010. (R. 98-99, 100-06.)[1] Plaintiff attributed his disability to "chest pains" and "feelings of anxiety and despair from [the chest pains]." (R. 27.) Plaintiff's applications were initially denied on August 18, 2010, and were again denied after reconsideration on December 10, 2010. (R. 41-44.) After his applications were denied, Plaintiff filed a written request for a hearing before an administrative law judge ("ALJ"). (R. 64.) A hearing took place on May 15, 2012 before ALJ Ruben Rivera, Jr. (R. 23-32.) Plaintiff was represented by counsel at the hearing and was the only witness to testify. (R. 23-32.)

The ALJ issued his decision on May 31, 2012, finding that Plaintiff is not disabled. (R. 11-18.) On July 30, 2012, Plaintiff sought review of the ALJ's decision by the Appeals Council. (R. 182-85.) On February 6, 2013, the Appeals Council denied Plaintiff's request for review. (R. 1-6.)

I.   Evidence Presented to the ALJ

The Court first will summarize the non-medical evidence presented to the ALJ before turning to the medical evidence.

---

[1] "R." denotes the administrative record filed by the Commissioner on July 10, 2013. (Docket Entry 10.)

A.  Non-Medical Evidence

1.  Work History

Plaintiff was born in 1959.  (R. 27.)  He has a high school diploma and has taken some college courses. (R. 27.)  From 1993 to 2003, Plaintiff worked as a private investigator, investigating fraudulent claims for worker's compensation.  (R. 151, 155.)  From 2001 to 2003, Plaintiff also worked as a marine patrol officer. (R. 151.)  His responsibilities included driving a boat; acting as a security officer; and lifting anchors, mooring lines, and coast guard equipment.  (R. 151, 154.)  From 2003 to 2005, Plaintiff worked as a jailor, where he was responsible for the security of the facility, as well as the care, custody, and control of inmates.  (R. 151, 153.)  From 2005 to 2010, Plaintiff worked as a deputy sheriff in a sheriff's office.  There, he was was responsible for security of the facility, as well as the care, custody, and control of inmates.  (R. 151, 152.)  While working as a deputy sheriff, Plaintiff would walk for eight to twelve hours per day, frequently lift ten-to-fifteen-pound objects and occasionally lift sixty-to-seventy-pound objects. (R 151-52.)  On May 13, 2010, Plaintiff was terminated from his deputy sheriff position due to alleged sexually inappropriate behavior towards a female co-worker.  (R. 151, 279.)

### 2.   Testimonial Evidence

At the hearing before the ALJ, Plaintiff testified that he lived in a homeless shelter and did not drive because his license had been suspended. (R. 30.)  He further testified that he had difficulty lifting thirty to forty pounds because his legs would "giv[e] out" and he could only stand about twenty to thirty minutes at a time and could only sit about forty-five minutes because of pain in his legs. (R. 28.)  Plaintiff rated his depression around an eight or nine on a ten-point scale. (R. 29.)  He stated that he would lose concentration and had trouble sleeping. (R. 30).

### 3.   Reports Submitted by Plaintiff

In connection with his applications, Plaintiff submitted a Function Report on June 17, 2010 and Disability Reports on September 23, 2010 and February 2, 2011.  In the Function Report, Plaintiff reported that he lived alone and took care of his dog. (R. 140-41.)  Plaintiff stated that he was able to drive a car and prepared light meals daily, shopped for light groceries, handled a savings account, used a checkbook, and paid bills. (R. 142-43.)  Plaintiff also stated that he would visit others to eat a meal or watch television two to three times a week, but also stated that he was not as socially active as he used to be. (R. 144.)  He was able to do laundry, but lacked the energy and motivation to bathe regularly. (R. 141.)  Finally, Plaintiff stated that he was tired

and depressed all of the time and that pain kept him awake at night. (R. 141.)

In the Disability Reports, Plaintiff stated that his depression, anxiety, and chronic fatigue were worsening, and that his chest pain and shortness of breath episodes were becoming more frequent. (R. 165, 172.) Plaintiff also complained that his vision had become impaired, that he tired very easily, and that he could not tolerate stress. (R. 165, 172.)

B.   Medical Evidence

On July 1, 2006, Plaintiff visited the hospital complaining of chest pain and shortness of breath. (R. 204.) A CT scan of the thorax revealed evidence of previous thoracic surgery, an enlarged heart, and artifacts from a left-sided cardiac pacemaker/defibrillator device. (R. 204.) There was no evidence of a pleural effusion or pulmonary embolus. (R. 204.) The CT scan revealed no significant change from a June 6, 2006 CT scan. (R. 204.)

On September 15, 2008, Plaintiff underwent a CT scan of the brain, which revealed a focus of hypodensity within the right caudate nucleus and within the right basal ganglia compatible with infarcts of indeterminate age. (R. 205.) There was no evidence of hemorrhage, mass effect, midline shift, or extra-axial fluid collection, and the ventricles were of normal size and configuration. (R. 205.) The next day, Plaintiff underwent a

vascular laboratory report, which revealed no hemodynamically significant lesion present. (R 207.) Plaintiff also underwent a CT angiogram of the head with CT of the brain on September 17, 2008, revealing small hypodensities in the right basal ganglia. (R. 206.) However, there was normal variant with a prominent left posterior communicating artery, no evidence of significant vascular abnormality, occlusion, or aneurysm, and there was no abnormal enhancement. (R. 206.) An echocardiogram from the same day revealed a mild degree of concentric left ventricular hypertrophy with normal wall motion, left atrial size in the upper limits of normal, as well as normal ejection fraction. (R. 215-16.)

Plaintiff underwent an unremarkable CT scan of the brain on February 16, 2009, which revealed normal third and lateral ventricles, and no intracerebral, subdural, or epidural blood collections. (R. 199.) Plaintiff also underwent a cervical spine evaluation on the same day, which indicated degenerative changes and limited visualization of the C7 vertebra, but no definite acute fracture. (R. 201.)

On March 19, 2009, Plaintiff visited Dr. Malvinder Makhni and underwent another echocardiogram, which revealed only moderate concentric left ventricular hypertrophy, a mild to moderately dilated left atrium, as well as trace mitral and tricuspid regurgitation. (R. 209-10.) Five days later, on March 24, 2009,

Dr. Makhni placed a stent into the saphenous vein graft to the circumflex after Plaintiff complained of increasing angina. (R. 211-12.) Plaintiff visited Dr. Makni once more, complaining of a cold, stating that he had been remodeling his home when he encountered black mold without a facemask. (R. 187.) Plaintiff was diagnosed with sinusitis and was given Augmentin. (R. 187.)

Dr. Dwight Dawkins examined Plaintiff on April 24, 2010 after he had complained of an irregular heartbeat. (R. 222.) A chest x-ray was performed, which showed resolving mild prominence of the pulmonary vascularity and no active infiltrates. (R. 222.) Additionally, there was no evidence of an acute cardiopulmonary process, and Plaintiff's pacemaker/defibrillator was in place. (R. 223.)

Plaintiff received a consultation from Dr. William Lasswell on April 22, 2010. (R. 229.) During the consultation, Plaintiff was alert and oriented times three, displayed normal vital signs, and his cardiac exam revealed a regular heart rate and rhythm without gallops, murmurs, or rubs. (R. 230.) Dr. Lasswell concluded that control of his type two diabetes was inadequate partly due to possible stress in the atrial fibrillation. (R. 230.) As a result, Plaintiff was put on Metformin, Januvia, and Levemir in an effort to resolve the issue. (R. 230.)

Plaintiff was also referred to cardiologist Dr. Ziad Marjieh for a consultation on April 23, 2010. (R. 232-33.) A physical examination revealed diminished S1 and S2 heart sounds, but no murmurs. (R. 233.) Dr. Marjieh concluded that Plaintiff had atrial fibrillation and cardiomyopathy, and should be placed on Coumadin. (R. 233.)

On April 26, 2010, an EKG report displayed a left axis deviation, pulmonary disease pattern, and no significant changes when compared with an ECG from two days prior. (R. 226). Plaintiff was released from the hospital on the same day after being placed on Coumadin to control his heart rate. (R. 228.)

During a follow up with Dr. Dawkins on May 12, 2010, Plaintiff's international normalized ratio was 1.4, and he was placed on a low dose of Coumadin. (R. 238.)

On June 21, 2010, Dr. Dawkins completed a treating source cardiac questionnaire, stating that Plaintiff had not experienced any recent cardiac events. (R. 259-61.) Dr. Dawkins indicated that Plaintiff had no limitations with regard to standing, walking, sitting, lifting, or carrying as a result of his cardiac condition, and was able to maintain a normal pace, as well as sustain physical activities. (R. 260.) He also stated that Plaintiff had not experienced any type of angina, silent ischemia, severe fatigue, malaise, palpitations, or syncope relating to Plaintiff's cardiac condition. (R. 260.) No exercise or chemical cardiac stress tests

were performed, but Dr. Dawkins indicated that such tests were not contraindicated due to Plaintiff's condition. (260-61.)

On June 16, 2010, Dr. Dawkins completed a mental impairment questionnaire and stated that Plaintiff did not suffer from a mental impairment that significantly interfered with daily functioning. (R. 258.)

On August 9, 2010 Plaintiff met with Dr. Kari Freedland Coelho, a licensed psychologist after being referred for a general clinical evaluation by the Office of Disability Determination. (R. 262.) He was able to drive himself to the appointment and arrived early. (R. 262.) He complained of depression, headache, fatigue, low energy level, poor motivation, poor self-esteem, isolation, anhedonia, and feelings of helplessness, hopelessness, and worthlessness. (R. 262.) Plaintiff reported that he was not participating in mental health treatment, but he had seen an outpatient psychiatrist ten years earlier. (R. 263.) He also stated that Dr. Dawkins had diagnosed him with depression and proscribed him alprazolam for his anxiety and stress. (R. 263.) He noted that in 2002, shortly after his wife had left him and took their daughter, he verbalized suicidal ideation during time spent on a voluntary basis at a hospital, but denied any present suicidal or homicidal ideation, gestures, plans or intent. (R. 263.) Plaintiff reported that he had been depressed for several

years, as he had endured significant losses in his life, including his father and brother.  (R. 263.)

When asked about his daily activities, Plaintiff acknowledged having insomnia and problems with his memory, but did not take any medications due to lack of health insurance or money. (R. 263-64.)  He was able to handle financial matters on his own, and had a limited social support system, consisting of a few friends.  (R. 264.)  He stated he was unable to partake in activities that give him pleasure, such as dating, due to a lack of money.  (R. 264.)  He also stated that he was able to drive, grocery shop, cook independently, and dress himself on a daily basis, but lacked the energy to handle housecleaning activities. (R. 264.)

During the mental status examination, Dr. Kari noted that Plaintiff demonstrated a full range of mood and affect that were appropriate to verbalize thoughts and feelings.  (R. 264.) He was oriented to person, place, time, and situation.  (R. 264.) He maintained good eye contact, moved about independently, and there were no signs of psychotic thought processes, including hallucinations or delusions.  (R. 264.)  Plaintiff's fund of knowledge was fair.  (R. 264.)  He knew the current president of the United States, the previous four presidents, as well as the capital of France.  (R. 264.)  He was able to remember three of three words immediately and after a ten-minute time lapse.  (R.

264.)  He solved serial sevens with one calculation error.  (R. 264.)  He solved verbal trails, verbal proverbs, and named objects within the examination room.  (R. 264.)  Finally, he had no difficulty solving double-digit calculations without a calculator and was able to remember four numbers forward and four numbers backwards.  (R. 264.)  Dr. Kari concluded that Plaintiff had a pain disorder, an anxiety disorder, and a dysthymic disorder.  (R. 264.)

On August 18, 2010, Dr. Jane Cormier performed a psychiatric review technique and found Plaintiff's mental impairments to be not severe. (R. 267.)  Dr. Cormier subsequently rated Plaintiff's functional limitations based on "B" criteria regarding listing 12.04 (Affective Disorder) and 12.06 (Anxiety-Related Disorder).  (R. 277); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, 12.06.  She indicated that Plaintiff suffered from only mild limitations on activities of daily living and maintaining social functioning, concentration, persistence, and pace.  (R. 277.)  Plaintiff also did not suffer episodes of decompensation. (R. 277.)  She ultimately concluded that Plaintiff's mental impairments were not severe, and he did not suffer significant limitation as a result of any mental health issue.  (R. 279.)

Dr. Michelle Butler performed a case analysis on October 18, 2010, during which she reconsidered Plaintiff's alleged disability due to depression and multiple medical problems.  (R.

281.)  She ultimately concluded that there were no worsening symptoms and that there was no new medical evidence regarding his mental condition on file.  (R. 281.)

On December 7, 2011, Plaintiff underwent an "initial screening" at New Horizons of the Treasure Coast, Inc. ("New Horizons") at the request of an employee from Florida's Department of Children and Families.  (R. 288-94.)  According to the employee, Plaintiff was living in unsanitary conditions; the home smelled like urine and there was feces on the floor and smeared on the walls as well as piled-up garbage.  (R. 288.)  Plaintiff reported that he had been severely depressed, had not eaten in three days, and had not slept for weeks.  (R. 288.)  Plaintiff had a flat affect, but was agreeable to obtaining treatment.  (R. 288.)  He stated that he had suicidal ideation in the past eighteen months, but he did not currently have any suicidal ideation, plan, or intent.  (R. 290.)  Plaintiff was oriented to person, place and time, displayed fair insight and poor judgment, and his content of thought was intact.  (R. 293.)  Plaintiff also displayed a depressed/sad mood, his appetite was small, and he had a reduced amount of motor activity and speech.  (R. 293.)  A social worker diagnosed major depressive disorder and rated Plaintiff's Global Assessment of Functioning (GAF) as twenty.[2]  (R. 292.)

---

[2] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of

On the same day, Plaintiff was voluntarily admitted to a local emergency room for depression and poor self-care. (R. 291.) During an emergency psychiatric/diagnostic evaluation, New Horizons concluded that Plaintiff was competent to provide express and informed consent for admission and treatment. (R. 286.) On December 13, 2011, Plaintiff achieved his goals while admitted, had a stable mood, had no overt psychotic symptoms, and denied suicidal or homicidal ideation. (R. 285.) He was discharged on the same day with a GAF of fifty-eight.[3] (R. 285.)

## II. Decision of the ALJ

After reviewing all of the evidence, the ALJ issued his decision on May 31, 2012, finding that Plaintiff is not disabled. (R. 13-18.) With respect to Plaintiff's depression and anxiety,

---

individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (alteration in original) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000)). "A GAF of 11 to 20 signifies 'some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute).'" Chamberlain v. Colvin, No. 13-CV-0065, 2014 WL 1280930, at *1 (N.D.N.Y. Mar. 27, 2014) (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 34)).

[3] "A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Kohler, 546 F.3d at 262 n.1 (alteration in original) (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32)).

the ALJ found that neither constituted a severe mental impairment because they "did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work." (R. 13.) However, the ALJ did find that Plaintiff's coronary artery disease, atrial fibrillation, and diabetes mellitus were severe impairments. (R. 13.) Nonetheless, the ALJ ultimately concluded that Plaintiff has the residual functional capacity ("RFC") to "perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(C)." (R. 16.)

Plaintiff sought review of the ALJ's decision by the Appeals Council. (R. 1-5, 182-85.) On February 16, 2013, the Appeals Council denied Plaintiff's request for review, stating that it "found no reason under [the] rules to review the Administrative Law Judge's decision." (R. 6.) Thus, the ALJ's decision is considered the final decision of the Commissioner. (R. 6.)

Plaintiff commenced this action on April 10, 2013. The Commissioner has moved for judgment on the pleadings. (Docket Entry 12.) Plaintiff has not submitted an opposition.

## DISCUSSION

## I.    Standard of Review

In reviewing the ruling of the ALJ, this Court will not determine de novo whether Plaintiff is entitled to disability benefits. Thus, even if the Court may have reached a different

decision, it must not substitute its own judgment for that of the ALJ. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560. If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).

## II.  Eligibility for Benefits

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive disability benefits. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. § 423(a), (d).  A claimant is disabled under the Act when he can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  Id. § 423(d)(2)(A).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011).  First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must prove that he suffers from a severe impairment that significantly limits his mental or physical ability to do basic work activities.  Id.

§ 404.1520(a)(4)(ii).  Third, the claimant must show that his impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations.  Id. § 404.1520(a)(4)(iii).  Fourth, if his impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity ("RFC") to perform tasks required in his previous employment.  Id. § 404.1520(a)(4)(iv).  Fifth, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform.  Id. § 404.1520(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step.  See Shaw v. Chater, 221 F.3d at 132; Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience."  Boryk ex rel. Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

Here, the ALJ performed the above analysis and first found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 13.) He then found that Plaintiff suffered from severe impairments due to his coronary artery disease, atrial fibrillation and diabetes mellitus, but that his anxiety and depression did not constitute severe mental impairments. (R. 13-14.) The ALJ next determined that neither Plaintiff's physical impairments nor a medical equivalent was among those enumerated in Appendix 1. (R. 15-16.) Finally, the ALJ found that Plaintiff has the RFC to "perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(C)" and that his past work as a deputy or private investigator does not require the performance of work-related activities precluded by Plaintiff's RFC. (R. 16-18.) The Court must determine whether the ALJ's decision is based on the correct legal principles and is supported by substantial evidence.

The Commissioner does not dispute the ALJ's findings in Plaintiff's favor: (1) that Plaintiff has not engaged in substantial gainful activity since May 13, 2010; and (2) that Plaintiff's coronary artery disease, atrial fibrillation, and diabetes mellitus are severe impairments. The Court finds that these conclusions are supported by substantial evidence and the ALJ did not misapply any applicable standards of law in this regard. However, for the reasons discussed below, remand is

necessary here because the ALJ erred in assessing the severity of
Plaintiff's mental impairments.

III. <u>Severity of Mental Impairments</u>

When determining the severity of a mental impairment,
the ALJ must apply the "special technique" set out in 20 C.F.R.
§ 404.1520a. The ALJ first must determine whether the claimant
has a "medically determinable mental impairment." 20 C.F.R.
§ 404.1520a(b)(1). If the claimant has such an impairment, the
ALJ must "rate the degree of functional limitation resulting from
the impairment(s) in accordance with paragraph (c)," which
specifies four broad functional areas: (1) activities of daily
living; (2) social functioning; (3) concentration, persistence, or
pace; and (4) episodes of decompensation. 20 C.F.R. §
404.1520a(c)(3). The first three areas (<u>i.e.</u>, activities of daily
living; social functioning; and concentration, persistence, or
pace) are rated on a five-point scale: "[n]one, mild, moderate,
marked, and extreme." 20 C.F.R. § 404.1520a(c)(4). The last area
(<u>i.e.</u>, episodes of decompensation) is rated on a four-point scale:
"[n]one, one or two, three, four or more." 20 C.F.R.
§ 404.1520a(c)(4).

"[I]f the degree of limitation in each of the first three
areas is rated 'mild' or better, and no episodes of decompensation
are identified, then the reviewing authority generally will
conclude that the claimant's mental impairment is not 'severe' and

will deny benefits." Kohler, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(d)(1)); accord Flagg v. Colvin, No. 12-CV-0644, 2013 WL 4504454, at *8 (N.D.N.Y. Aug. 22, 2013) ("A mental impairment is generally found not severe if the degree of limitation in the first three areas is mild or better and there are no episodes of decompensation." (citation omitted)). However, if the mental impairment is deemed severe, the ALJ must "first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(d)(2)). If so, the claimant is disabled. Id. If not, the ALJ must then assess the claimant's RFC. Id. (citing 20 C.F.R. § 404.1520a(d)(3)).

Here, the ALJ assessed Plaintiff's degree of limitation in each of the first three areas as "mild," and found that Plaintiff "has experienced no episodes of decompensation which have been of extended duration." (R. 15.) Based on these findings, the ALJ concluded that Plaintiff's mental impairments were not severe. (R. 13-15.) The Court finds that the ALJ's assessment of Plaintiff's degree of limitation in each of the first three areas as "mild" is supported by substantial evidence in the record. However, the Court cannot say the same regarding the ALJ's finding that Plaintiff has not experienced any episodes of decompensation.

The Social Security regulations define "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(C)(4). The regulations further state that "[e]pisodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)" and may be inferred "from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(C)(4).

The ALJ's conclusion that Plaintiff has not experienced any episodes of decompensation is not supported by substantial evidence. First, the ALJ's decision found that Plaintiff "has experienced no episodes of decompensation which have been of extended duration." However, under the "special technique" for assessing the severity of mental impairments, the ALJ is not asked to identify episodes of decompensation "which have been of extended

duration." Rather, the duration of the episode may be used to infer whether an episode of decompensation occurred. Second, the record includes evidence that Plaintiff experienced an episode of decompensation in December 2011, more than a year after Dr. Cormier reported that Plaintiff had not experienced any episodes of decompensation. Specifically, on December 7, 2011, Plaintiff was sent for "initial screening" at New Horizons at the request of the Department of Children and Families, which had observed Plaintiff living in unsanitary conditions. (R. 288-94.) His home smelled like urine and there was feces on the floor and smeared on the walls. (R. 288.) Plaintiff reported that he had not eaten in three days and that he had not slept for weeks. (R 288.) A social worker diagnosed major depressive disorder and rated Plaintiff's GAF as twenty, which, as previously noted, signifies "'some danger of hurting self or others . . . or occasional[ ] fail[ure] to maintain minimal personal hygiene . . . or gross impairment in communication.'" Chamberlain, 2014 WL 1280930, at *1 (citation omitted). Moreover, although Plaintiff showed improvement and was released from the hospital shortly thereafter, his GAF was rated at fifty-eight, which indicates "'[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Kohler, 546 F.3d at 262 n.1 (alteration in original) (emphasis added).

Based on the foregoing evidence, the ALJ's conclusion that Plaintiff had not experienced an episode of decompensation is not supported by substantial evidence, since significant evidence in the record exists suggesting that Plaintiff had experienced an episode of decompensation in 2011.

Accordingly, this case is remanded to the Commissioner for reapplication of the special technique for evaluating mental impairments. Since the remainder of the ALJ's decision depends on the outcome of the application of the special technique, the Court will not proceed further.

<u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is DENIED and this action is REMANDED for further proceedings consistent with this Memorandum and Order. The Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED.

/S/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September __30__, 2014
           Central Islip, NY